Abdus-Salaam, J.
(dissenting). When is a duly enacted law of the State of New York not part of “the laws of the State of New York”? One would think that the answer is never. But the majority disagrees. In the majority’s estimation, a law passed by New York elected representatives is not part of the “laws of the State of New York” if those legislators modeled the statute on a common-law rule specifying a particular jurisdiction’s laws as controlling the disposition of a person’s property upon death. Thus, the majority holds that, where a governing-law clause in a death or retirement benefit plan declares that the “laws of the State of New York” are controlling, the clause waives the application of Estates, Powers and Trusts Law § 3-5.1 (b) (2), which is a properly enacted law of New York dealing with property dispositions upon death (see majority op at 468). In light of that holding, the majority answers in the negative the first question of law certified to us by the United States Court of Appeals for the Second Circuit, and it declines to answer the second question on the ground that no answer is necessary to the resolution of this appeal (see majority op at 470, 477).
In reaching the erroneous conclusion that the decedent Reverend Clark Flesher and the Ministers and Missionaries Benefit Board (MMBB) implicitly waived the provisions of EPTL 3-5.1 (b) (2) via the governing-law clauses of their death benefit and retirement plans, the majority relies on our decision in IRB-Brasil Resseguros, S.A. v Inepar Invs., S.A. (20 NY3d 310 [2012]). But, a close examination of that decision reveals that the majority is incorrect, for IRB-Brasil Resseguros, S.A. identifies New York substantive law, such as EPTL 3-5.1 (b) (2), as exactly the sort of New York law invoked by a governing-law clause of the kind at issue here. Consequently, I would answer the first certified question in the affirmative. Furthermore, because the plain language of EPTL 3-5.1 (b) (2) clearly demonstrates that the benefit plans at issue here are covered by that statute, the second certified question should be answered in the affirmative as well. Accordingly, I respectfully dissent from the majority’s decision to answer the first certified question in the negative and to decline to answer the second certified question.
*478 I.
A
The first certified question asks
“[w]hether a governing-law provision that states that the contract will be governed by and construed in accordance with the laws of the State of New York, in a contract not consummated pursuant to New York General Obligations Law section 5-1401, requires the application of New York Estates, Powers & Trusts Law section 3-5.1(b)(2), a New York statute that may, in turn, require application of the law of another state” (see Ministers & Missionaries Benefit Bd. v Snow, 780 F3d 150, 155 [2d Cir 2015]).
The statute at the heart of this question, EPTL 3-5.1 (b) (2), is part of the EPTL article setting forth the “[s]ubstantive [l]aw of [w]ills” (EPTL art 3); the statute states, “[t]he intrinsic validity, effect, revocation or alteration of a testamentary disposition of personal property, and the manner in which such property devolves when not disposed of by will, are determined by the law of the jurisdiction in which the decedent was domiciled at death.” Thus, under the statute, if the decedent is domiciled in New York at the time of death, the devolution of property not disposed of by will is determined by, among other provisions, EPTL 5-1.4, which declares in relevant part:
“[e]xcept as provided by the express terms of a governing instrument, a divorce . . . revokes any revocable (1) disposition or appointment of property made by a divorced individual to, or for the benefit of, the former spouse, including, but not limited to, a disposition or appointment by will, by security registration in beneficiary form (TOD), by beneficiary designation in a life insurance policy or (to the extent permitted by law) in a pension or retirement benefits plan” (EPTL 5-1.4 [a]).
Accordingly, when a person dies while domiciled in New York, his or her ex-spouse cannot recover any death or retirement benefits under the decedent’s relevant plans because the divorce prior to death selves as a revocation of the beneficiary designation by operation of law. However, since the statute does not cut off the ex-spouse’s family members, New York law would still appear to permit a resident decedent’s former in- *479 law named as a beneficiary of such plans to recover the benefits upon the death of the decedent, notwithstanding the divorce. By contrast, the former in-law’s beneficiary designation would be revoked if the decedent perished while domiciled in another jurisdiction, such as Colorado, which has a statute automatically removing ex-spouses and their relatives as beneficiaries of the decedent’s benefit policies upon death (see Colo Rev Stat § 15-11-804 [2]).
In addition to these statutory principles, we must look to the relevant rules for interpreting a benefit plan to discern the manner in which EPTL 3-5.1 (b) (2) impacts such plans. Because the MMBB policies at issue in this case are, in effect, contracts between Flesher and MMBB for the payment of death and retirement benefits, they are logically subject to the same rules of construction as a life insurance policy or similar contract. Under those rules, a court “bear[s] the responsibility of determining the rights or obligations of parties under insurance contracts based on the specific language of the policies,” and unambiguous provisions “must be given their plain and ordinary meaning” (Sanabria v American Home Assur. Co., 68 NY2d 866, 868 [1986]). “Contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous the terms are to be taken and understood in their plain, ordinary and proper sense” (Johnson v Travelers Ins. Co., 269 NY 401, 408 [1936]; see Roman Catholic Diocese of Brooklyn v National Union Fire Ins. Co. of Pittsburgh, Pa., 21 NY3d 139, 148 [2013]). A contract’s express choice-of-law clause takes precedence over any contrary common-law choice-of-law principles, provided that the contract has some reasonable relationship to New York and does not violate New York public policy (see Reger v National Assn. of Bedding Mfrs. Group Ins. Trust Fund, 83 Misc 2d 527, 540-541 [Sup Ct, Westchester County 1975]; see also Bank of N.Y. v Yugoimport, 745 F3d 599, 609 [2d Cir 2014]; see generally Welsbach Elec. Corp. v MasTec N. Am., Inc., 7 NY3d 624, 629 [2006] [“Generally, courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction,” unless the chosen law “violates some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal” (internal quotation marks and citations omitted)]).
We reaffirmed this principle in IRB-Brasil Resseguros, S.A. v Inepar Invs., S.A. (20 NY3d 310), a case that did not involve *480 the disposition of property upon death. In IRB-Brasil Resseguros, S.A., the plaintiff Brazilian corporation purchased a series of notes issued by the defendant Uruguayan corporation and guaranteed by the defendant Brazilian power company (see id. at 312-313). The guarantee contract under which the notes were issued stated that the agreement would be “governed by, and ... be construed in accordance with, the laws of the State of New York” (id. at 313). Because the parties’ transaction involved the exchange of more than $250,000, it fell within the ambit of General Obligations Law § 5-1401 (1), which states in relevant part,
“ ‘[t]he parties to any contract . . . arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars . . . may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears a reasonable relation to this state’ ” (id. at 314, quoting General Obligations Law § 5-1401 [1]).
Eventually, the defendant corporation defaulted on its obligations under the notes, and the plaintiff corporation sued to recover damages under the guarantee contract (see id. at 313-314). The defendant power company opposed the suit in part on the ground that, under a New York common-law conflict-of-laws analysis, Brazilian substantive law should be applied in interpreting the contract (see id. at 313).
On appeal, we decided that New York substantive law, but not New York choice-of-law principles or Brazilian law, controlled the interpretation of the contract in accordance with the choice-of-law clause (see id. at 314-316). As a starting point for the analysis, we determined that the legislature had passed General Obligations Law § 5-1401 out of concern that parties to large contracts, which lacked sufficient contacts with New York, might be unable to effectively invoke New York substantive law, despite an express contractual provision designating New York law as the controlling legal framework, because courts might apply common-law choice-of-law principles and decide that the law of a jurisdiction with a greater connection to the transaction should control (see id. at 314). Hence, the statute was designed to allow parties to large contracts that were otherwise unconnected to New York to choose to have their contracts interpreted in accordance with New York law (see id. at 315).
*481 “Applying General Obligations Law §§ 5-1401 and 5-1402 to the facts of the present case,” we “conclude[d] that New York substantive law must govern, since the parties designated New York in their choice-of-law provision in the Guarantee and the transaction exceeded $250,000” (id. at 315). We also rejected the defendant corporation’s argument that the entirety of New York common law, including New York’s common-law choice-of-law principles, should control the interpretation of the contract because the guarantee contract used the unlimited phrase “governed by . . . the laws of the State of New York,” without explicitly excluding New York choice-of-law rules (id. at 315). We explained:
“Express contract language excluding New York’s conflict-of-laws principles is not necessary. The plain language of General Obligations Law § 5-1401 dictates that New York substantive law applies when parties include an ordinary New York choice-of-law provision, such as appears in the Guarantee, in their contracts. The goal of General Obligations Law § 5-1401 was to promote and preserve New York’s status as a commercial center and to maintain predictability for the parties. To find here that courts must engage in a conflict-of-laws analysis despite the parties’ plainly expressed desire to apply New York law would frustrate the Legislature’s purpose of encouraging a predictable contractual choice of New York commercial law and, crucially, of eliminating uncertainty regarding the governing law.” (id. at 315-316).
We also observed that the Restatement (Second) of Conflict of Laws supported the conclusion that the contractual choice-of-law clause was intended to apply only New York substantive law because that treatise said, “ ‘[i]n the absence of a contrary indication of intention, the reference [to the law of the state chosen by the parties] is to the local law of the state of the chosen law’ ” (id. at 316, quoting Restatement [Second] of Conflict of Laws § 187 [3]). Importantly, we continued, “ ‘[l]ocal law’ is defined as ‘the body of standards, principles and rules, exclusive of its rules of Conflict of Laws’ ” (id., quoting Restatement [Second] of Conflict of Laws § 4 [1]). Thus, we said, “[u]nder the Restatement (Second), the parties’ decision to apply New York law to their contract results in the application of New York substantive law, not New York’s conflicts principles,” *482 and we added, “[i]t strains credulity that the parties would have chosen to leave the question of the applicable substantive law unanswered and would have desired a court to engage in a complicated conflict-of-laws analysis, delaying resolution of any dispute and increasing litigation expenses” (id. at 316). Accordingly, IRB-Brasil Resseguros, S.A. holds that a contract which both is subject to General Obligations Law § 5-1401 and designates New York law as controlling must be interpreted in accordance with New York substantive law, and the decision supports the more general proposition that, in most instances, a contractual provision stating that New York law governs must be read to invoke only New York substantive law, rather than common-law choice-of-law principles.
The principle that a contractual governing-law provision generally precludes a common-law choice-of-law analysis has never been extended to eliminate the application of a statutory choice-of-law directive, which otherwise would be the applicable local and substantive law of the State {see Restatement [Second] of Conflict of Laws § 4 [1]). In fact, as we explained in IRB-Brasil Resseguros, S.A., the parties’ choice of New York law does not remove a contract from the ambit of “ ‘[l]ocal law,’ ” and because such local law includes New York’s substantive “ ‘body of standards, principles and rules,’ ” New York statutory standards, principles and rules logically govern a contract that deems the State’s law to be controlling (IRB-Brasil Resseguros, S.A., 20 NY3d at 316, quoting Restatement [Second] of Conflict of Laws § 4 [1]).
In that vein, there is ample authority demonstrating that a New York statute embodies the State’s substantive policy, which we cannot readily presume to have been cast aside by a contractual governing-law provision. New York courts have held that where a conflict arises between the provisions of a statute and the terms of a contract, the statute typically controls because it is the binding substantive policy determination of the legislature (see e.g. Fred Schutzman Co. v Park Slope Advanced Med., PLLC, 128 AD3d 1007, 1008 [2d Dept 2015]; Liberty Mut. Ins. Co. v Aetna Cas. & Sur. Co., 168 AD2d 121, 131 [2d Dept 1991]), though a statutory right may be waived expressly or by unequivocal and necessary implication (see John J. Kassner & Co. v City of New York, 46 NY2d 544, 551 [1979]; O’Brien v Lodi, 246 NY 46, 50 [1927]). Additional authority for a statute’s role as the substantive local law of a state can be found in the Restatement (Second) of Conflict of *483 Laws, which declares that “[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law” (Restatement [Second] of Conflict of Laws § 6 [1] [emphasis added]). Thus, unlike the common-law conflict rules at issue in IRB-Brasil Resseguros, S.A. and similar cases, statutory rules make up the substantive law of the state and cannot be easily or presumptively dispensed with by contrary provisions of a contract; indeed, in some instances, it is impossible for contracting parties to avoid the application of a state statute, even where they clearly and expressly agree to do so (see Matter of Consolidated Rail Corp. v Hudacs, 223 AD2d 289, 293 [3d Dept 1996], affd 90 NY2d 958 [1997]; cf Estro Chem. Co. v Falk, 303 NY 83, 87 [1951]). It follows that, where, as here, the parties have agreed to apply the substantive law of New York, they presumably have agreed to eliminate common-law choice-of-law rules that are inconsistent with their definitive choice of law under the contract (see IRB-Brasil Resseguros, S.A., 20 NY3d at 316), but they have not clearly manifested an intent to waive application of statutory choice-of-law directives such as EPTL 3-5.1 (b) (2), which form part of the very substantive law that the parties have opted to apply.
B
Nonetheless, the majority insists that EPTL 3-5.1 (b) (2) is a choice-of-law rule that stands on equal footing with the common-law choice-of-law principles discussed in IRB-Brasil Resseguros, S.A., such that a contractual choice-of-law clause necessarily forecloses application of the statute in the same manner as it does the common-law rules (see majority op at 473-474). In this respect, the majority’s argument appears to rest on two false premises: (1) a statute that directs the application of another state’s testamentary laws is no different from the common law’s contacts-based choice-of-law framework and hence can never be a substantive law (see majority op at 473-474); and (2) the enforcement of a statute that is based on a common-law rule may be easily waived in the same manner as the common-law rule that inspired it (see majority op at 474). As will be shown, however, the first premise is unfounded in this case because it is contrary to the basic character and history of EPTL 3-5.1 (b) (2) (not to mention the authorities discussed above), and the second premise is not supported by any legal authority.
In adopting the first premise set forth above, the majority misapprehends the nature of EPTL 3-5.1 (b) (2). While EPTL *484 3-5.1 (b) (2) does direct the choice of a particular state’s law on the handling of a certain type of property upon a person’s death, it does not codify the sort of complex decisional choice-of-law analysis which parties presumably seek to avoid in agreeing that the law of New York will govern a contract. Unlike that common-law analysis, which requires the parties to any type of contract to determine on a case-by-case basis whether they and the transaction have sufficient contacts with a particular state to trigger the application of that state’s substantive law (see Zurich Ins. Co. v Shearson Lehman Hutton, 84 NY2d 309, 317-320 [1994]), the statute here provides clearer guidance for a narrower subset of contracts by specifying that the law of the decedent’s domicile at death will invariably apply to a testamentary or similar disposition of personal property. In this sense, EPTL 3-5.1 (b) (2) is just as much a substantive determination of the most reasonable means to dispose of personal property as it is a choice-of-law measure, and as a result, it does not set forth simply another extremely broad and complex conflict analysis that may be presumptively discarded by a contractual governing-law clause.
Indeed, the legislature plainly considered EPTL 3-5.1 (b) (2) to be a significant part of the State’s substantive policy regarding the distribution of personal property upon death, distinguishing it from conflict principles that arose purely from decisional law and are not protected by legislation. The legislature enacted the predecessor statutes to EPTL 3-5.1 (b) (2) to enshrine in New York statutory law the common-law rule that the law of the state where a decedent is domiciled at the time of death should govern the disposition of personal property upon death (see Revisers’ Notes, McKinney’s Cons Laws of NY, EPTL 3-5.1; see also Matter of Gifford, 279 NY 470, 474-475 [1939]). In taking this step, the legislature evidently made a substantive decision that the aforementioned rule was so important that it should not be disturbed in this state by any subsequent change in the common law via judicial decision-making.
In addition, the legislature enacted substantive changes to the scope of this rule over time, making conscious policy choices to chart the course of this aspect of estates law. When the rule first appeared in statutory form in 1880, the statute stated,
“[e]xcept where special provision is otherwise made by law, the validity and effect of a testamentary disposition of any other property [besides realty] situated within the State, and the ownership and *485 disposition of such property, where it is not disposed of by will, are regulated by the laws of the state or country, of which the decedent was a resident, at the time of his death” (Code Civ Pro § 2694).
In 1911, when the legislature amended Decedent Estate Law § 47, it set forth the same rule but gave individuals some flexibility to choose the law of disposition for all of their personal property in the express provisions of a will — not other means of disposition — by adding,
“[w]henever a decedent, being a citizen of the United States, wherever resident, shall have declared in his will and testament that he elects that such testamentary dispositions shall be construed and regulated by the laws of this state, the validity and effect of such dispositions shall be determined by such laws” (L 1911, ch 244, § 1).
Furthermore, the incorporation of Decedent Estate Law § 47 into the EPTL via section 3-5.1 (b) (2) was no less substantive than the previous legislation. In that regard, the legislature passed EPTL 3-5.1 (b) (2) as part of a legislative package meant to overhaul the substance of New York’s estates law. As stated by a member of the Temporary Commission on Estates, which drafted the EPTL, the legislation was a provision “for the substantive law” and designed “to collect into one volume all the substantive law relating to estates” (Letter of Hon. John M. Keane, Bill Jacket, L 1966, ch 952 at 76). In approving the legislation, the Governor noted that it “ma[de] numerous substantive changes in existing law” and wisely consolidated previous enactments in this field (Governor’s Mem of Approval, Bill Jacket, L 1966, ch 952 at 91, 1966 NY Legis Ann at 363). Indeed, article 3 of the EPTL, which contains EPTL 3-5.1 (b) (2), is entitled “Substantive Law of Wills” (EPTL art 3), underscoring that its provisions, such as EPTL 3-5.1 (b) (2), are exactly the sort of substantive expression of New York public policy that contracting parties adopt when they agree to have their agreement governed by New York law.[1]
As for EPTL 3-5.1 more particularly, the legislature passed that statute in response to substantive policy concerns. One *486 scholar has described the development of the statute and the driving policy considerations behind it as follows:
“Recognizing ‘the need for a fresh approach to the legal problems presented by multi-jurisdictional transactions and for a release from the traditional bind of antiquated and moribund rules,’ the Bennett Commission undertook to design ‘substantive rules to govern the testamentary and intestate distribution of multi-jurisdictional estates.’ The resulting comprehensive set of rules for the regulation of wills and estates that are related to a jurisdiction other than New York is set forth in EPTL 3-5.1 and makes New York ‘a pathfinder in this area of estate law.’ ” (Joseph T. Arenson, An Analysis of Certain Provisions of the Estates, Powers and Trusts Law, 33 Brook L Rev 425, 445 [1967]).
And while this new “pathfind[ing]” law “codified” the “settled rule that the intestate distribution of the personal property of a decedent be determined by the law of his domicile at the time of his death,” it did so in the context of a statutory framework that had been “clarified and expanded” by EPTL 3-5.1 as a whole (id. at 445-448 [emphasis added]). In other words, EPTL 3-5.1 is not a reflexive or inconsequential repetition of a common-law conflict principle that might be readily waived sub silentio by parties to a contract, but instead represents the legislature’s considered judgment to keep some aspects of the common law constant while simultaneously modifying others. As a result, EPTL 3-5.1 (b) (2) works in tandem with the other provisions of the EPTL to create a body of local substantive standards for the disposition of personal property upon a person’s death, and contracting parties’ choice of New York law invokes, and does not waive, the enforcement of the statute.
This legislative policy choice casts the contracts here in a different light than the one in IRB-Brasil Resseguros, S.A. In that case, because the contract fell within the ambit of General Obligations Law § 5-1401, we interpreted the contract in light of the policy behind that statute (see IRB-Brasil Resseguros, S.A., 20 NY3d at 313-315). Given that General Obligations *487 Law § 5-1401 reflected the legislature’s desire to make it easier for parties to large contracts to avoid a common-law choice-of-law analysis, we harmonized that policy with the language of the contract to infer that the parties’ generalized invocation of New York law reflected their intent to waive the application of common-law conflict rules in a manner consistent with— indeed, buttressed by — the legislative scheme, and in that context, we concluded that it would have made little sense to draw a contrary inference regarding the parties’ wishes (see id. at 315-316). By contrast, here, any inference that the parties intended to eliminate the application of EPTL 3-5.1 (b) (2) would be in tension with the legislature’s desire to ensure that, in most cases, personal property not disposed of by will shall pass in accordance with the laws of the decedent’s last domicile, and hence we must reject the view that the parties implicitly signaled an intent to abandon that legislative directive and instead interpret the contract consistently with the substantive policy embodied in EPTL 3-5.1 (b) (2), just as we did in IRB-Brasil Resseguros, S.A.
Moreover, even if it can be assumed that the parties to a contract usually mean to escape the reach of certain state statutes solely by declaring that the contract will be “governed by the laws of New York,” it would make little sense to make that assumption with respect to the particular statute at issue here. After all, the parties to a death benefit contract would ordinarily expect that, regardless of which state’s law they choose, they will be subject to the rule that the law of the state of domicile determines the recipients of personal property upon the owner’s death. That is so because a clear majority of states follow that rule (see Hoglan v Moore, 219 Ala 497, 501, 122 So 824, 828 [1929]; Vansickle v Hazeltine, 29 Idaho 228, 233-234, 158 P 326, 327 [1916]; Gibson v Dowell, 42 Ark 164, 166 [1883]; In re Moore’s Estate, 190 Cal App 2d 833, 841-843, 12 Cal Rptr 436, 440-441 [4th Dist 1961]; In re Madril’s Estate, 71 Colo 123, 126, 204 P 483, 484 [1922]; Oehler v Olson, 2005 WL 758038, *2, 2005 Conn Super LEXIS 574, *5-6 [Feb. 28, 2005, No. CV030083327]; PNC Bank, Delaware v New Jersey State Socy. for Prevention of Cruelty to Animals, 2008 WL 2891150, *2 n 3, 2008 Del Ch LEXIS 288, *5 n 3 [July 14, 2008]; Cockrell v Lewis, 389 So 2d 307, 308 [Fla Dist Ct App, 5th Dist 1980]; In re Estate of Grant, 34 Haw 559, 564 [1938]; Davis v Upson, 209 Ill 206, 212-213, 70 NE 602, 604 [1904]; Thieband v Sebastian, 10 Ind 454, 456 [1858]; Lincoln’s Estate v Briggs, *488 199 NW2d 337, 338 [Iowa 1972]; Matter of Estate of Rivas, 233 Kan 898, 901, 666 P2d 691, 693 [1983]; Radford v Fidelity & Columbia Trust Co., 185 Ky 453, 459, 215 SW 285, 288 [1919]; Williams v Pope Mfg. Co., 52 La Ann 1417, 1438-1439, 27 So 851, 860 [1900]; Smith v Howard, 86 Me 203, 205-206, 29 A 1008, 1009 [1894]; Harding v Schapiro, 120 Md 541, 548, 87 A 951, 954 [1913]; Blake v Williams, 23 Mass 286, 314 [1828]; In re Sewart’s Estate, 342 Mich 491, 499-501, 70 NW2d 732, 736-737 [1955]; Lane v St. Louis Union Trust Co., 356 Mo 76, 82, 201 SW2d 288, 291 [1947]; In re Smith’s Estate, 126 Mont 558, 563, 255 P2d 687, 690 [1953]; In re Forney’s Estate, 43 Nev 227, 232, 184 P 206, 206 [1919]; Cade v Davis, 96 NC 139, 147, 2 SE 225, 228 [1887]; In re Coleman’s Estate, 98 NW2d 784, 789 [ND 1959]; In re Estate of Luoma, 2011-Ohio-4701, ¶ 28 [Ct App 2011], https://supremecourt.ohio.gov/rod/docs/pdfill/ 2011/2011-0hio-4701.pdf; In re Revard’s Estate, 178 Okla 524, 526, 63 P2d 973, 976 [1936]; Pickering v Pickering, 64 RI 112, 117-120, 10 A2d 721, 723-724 [1940]; cf. Smith v Normart, 51 Ariz 134, 138, 75 P2d 38, 40 [1938]; but see Neblett v Neblett, 112 Miss 550, 559, 73 So 575, 576 [1916]; State by Van Riper v American Sugar Ref. Co., 20 NJ 286, 301-302, 119 A2d 767, 775-776 [1956]). Therefore, although the parties here presumably wished that New York contract interpretation rules would determine the decedent’s rights during life and some other aspects of the contract, it would have been odd for them to have sought the application of an outlier rule for choosing the law regarding the disposition of the property upon death.
By the same token, the commonplace nature of the rule set forth in EPTL 3-5.1 (b) (2) belies the majority’s suggestion that Flesher and MMBB could not have anticipated that their benefit contracts would trigger the law of the state where Flesher would be domiciled at death (see majority op at 476; id. at 476 n 8).[2] Certainly, MMBB, which has as one of its central purposes the administration of property distributions upon a *489 plan member’s death, had good reason to learn of the widespread domicile-based rule and to explicitly waive application of that principle if it saw fit to do so. Instead, MMBB agreed to contracts containing only a generic invocation of New York law, without addressing either EPTL 3-5.1 (b) (2) in particular or the routinely-followed doctrine it embodies more generally.
The majority also claims that, absent a finding that a generalized governing-law clause presumptively waives statutory choice-of-law directives such as EPTL 3-5.1 (b) (2), benefit plan administrators will face the intolerable burden of familiarizing themselves with the revocation laws of every state where plan members might die because they cannot know in advance the state of domicile at death (see majority op at 475-476). Initially, though, there is no proof in the record of the extent of this alleged burden, and nothing suggests that organizations like MMBB are unable to have their attorneys perform the necessary research without extreme expense or delay. More to the point, plan administrators can eliminate this burden by adding an extra sentence to each benefit contract expressly precluding the application of the chosen jurisdiction’s statutory choice-of-law directives.
All of the foregoing discussion belies the majority’s evident belief that EPTL 3-5.1 (b) (2) is no different than, and creates the same practical difficulties as, the common-law conflicts analysis discussed in IRB-Brasil Resseguros, S.A.
As for the second major premise underlying the majority’s opinion — that a statute based on the common law may be waived by a generalized governing-law clause because such a clause may waive certain common-law rules — it is simply unprecedented. The majority does not cite any authority for the novel proposition that a statute inspired by the common law may be more readily evaded by a governing-law clause than a statute designed to depart from the common law, and *490 there is no logical support for that notion. Regardless of whether the legislature adopts or disavows a common-law principle in passing a law, the statute retains its force as a binding substantive policy choice of the State, compelling the adherence of contracting parties absent a clear waiver of its application. Indeed, if anything, the legislature’s decision to incorporate a common-law rule into a statute shows its desire to elevate the rule’s stature above its prior position as an ordinary common-law rule that might have been more easily waived.
In sum, a contract section that specifies that the contract must be “governed by and construed in accordance with the laws of the State of New York” should be interpreted to incorporate the entire body of New York’s substantive statutory law (see Restatement [Second] of Conflict of Laws § 187 [1], [3]), including EPTL 3-5.1 (b) (2). Thus, I would answer the first certified question in the affirmative.
IL
Because I would answer the first certified question in the affirmative, I find it necessary to answer the second certified question to resolve this case. The second question asks “whether a person’s entitlement to proceeds under a death benefit or retirement plan, paid upon the death of the person making the designation, constitutes ‘personal property . . . not disposed of by will’ within the meaning of New York Estates, Powers & Trusts Law section 3-5.1(b)(2)” (Ministers & Missionaries Benefit Bd., 780 F3d at 155). As noted in this question, EPTL 3-5.1 (b) (2) applies to, among other things, a decedent’s “personal property . . . not disposed of by will,” and it incorporates a related statutory subdivision’s definition of “personal property” as “any property other than real property, including tangible and intangible things” (EPTL 3-5.1 [a] [2]). The parties agree that, in general, a benefit plan and the rights thereunder are “personal property,” as those contractual rights are “intangible things” which do not create or transfer an interest in real property.
The Snows nevertheless assert that the plan and any payments thereunder were not Flesheds personal property, and hence are not his estate’s property, because MMBB must transfer all benefits under the plans to the Snows immediately upon death in accordance with the beneficiary designation forms. But a member of a benefit plan, such as Flesher, person *491 ally controls the entitlement to the proceeds of the plan, holding an intangible property right that is “personal” to the member and subject to his or her disposition “not ... by will” via the governing contract (EPTL 3-5.1 [b] [2]). In that regard, like the holder of a life insurance policy, a member of a benefit plan essentially owns the benefits of the plan while he or she is alive because he or she can control the transfer of those funds by choosing a beneficiary. It is for this reason that, under the common law of this State, a life insurance policy has traditionally been regarded as a chose in action, which is the personal property of the holder (see Olmsted v Keyes, 85 NY 593, 598-601 [1881]). Thus, a benefit plan and its attendant rights are the “personal property” of the plan member during his or her life within the meaning of EPTL 3-5.1 (b) (2), and until the validity of a beneficiary designation can be conclusively established in a probate proceeding, these property rights become inextricably linked with the plan member’s estate and the proceedings thereon following his or her death.
Additionally, a death benefit plan and a retirement benefit plan confer property rights that are “not disposed of by will” within the meaning of EPTL 3-5.1 (b) (2). It is true, as the Snows observe, that the phrase “not disposed of by will,” read in isolation, could be construed as a reference to the transfer of property in accordance to the rules of intestate succession rather than by a written instrument like a benefit plan. However, in the context of the remaining terms of EPTL 3-5.1 (b) (2), the disputed phrase applies to benefit plans. Notably, the statute is broadly worded to apply to virtually all dispositions of personal property upon death, including both “testamentary disposition [s]” of property and the “devolution] ” of property “not disposed of by will,” and given this wide-ranging language, it makes sense to interpret the phrase “not disposed of by will” to cover both property that passes by rules of intestate succession and property, such as entitlements under a benefit plan, that devolves via a beneficiary designation not included in a formal will. Accordingly, because a benefit plan, which belongs to the plan member in life and transfers funds upon death, resembles a substitute testamentary instrument such as a trust with lifetime benefits (see e.g. Matter of Reynolds, 87 NY2d 633, 636 [1996] [trust as testamentary instrument]; Matter of Riefberg, 58 NY2d 134, 138-139 [1983] [stockholders’ agreement]; see also 38 NY Jur 2d, Decedents’ Estates § 260) and yet is not technically a will or controlled *492 thereby, it qualifies as personal property of the decedent which is “not disposed of by will” under EPTL 3-5.1 (b) (2).
The Snows maintain that it would be illogical to hold that EPTL 3-5.1 (b) (2) governs death and retirement benefit plans because another statute, EPTL 13-3.2 (a), expressly preserves plan beneficiary designations that EPTL 3-5.1 (b) (2) might otherwise disrupt if it applied to such benefit plans. However, this contention runs afoul of the modest intended scope of EPTL 13-3.2 (a). That statute says,
“[i]f a person is entitled to receive . . . payment in money, securities or other property under a pension, retirement, death benefit, stock bonus or profit-sharing plan . . . the rights of persons so entitled or designated and the ownership of money, securities or other property thereby received shall not be impaired or defeated by any statute or rule of law governing the transfer of property by will, gift or intestacy.”
At first glance, because my reading of EPTL 3-5.1 (b) (2) would make it a statute that governs a vast array of transfers of personal property upon the death of the owner, including transfer by will or intestacy, EPTL 13-3.2 (a) arguably seems to preserve beneficiary designations in benefit plans, even where EPTL 3-5.1 (b) (2) threatens to undo those designations. But the legislative history of the statute clarifies that this provision was never intended to create the sort of perplexing conflict with EPTL 3-5.1 (b) (2) that the Snows envision.
As observed by the Appellate Division in Kane v Union Mut. Life Ins. Co. (84 AD2d 148 [2d Dept 1981]), the legislative history of EPTL 13-3.2 (a) reveals that it was primarily intended to recodify a provision of the Personal Property Law that had prevented courts and estate representatives from invalidating beneficiary designations on the ground that the designation forms did not bear the same formalities as a will. The Appellate Division explained:
“Generally stated, the law of this State is that the designation of a beneficiary to a pension, retirement annuity or other insurance contract is not a testamentary act which must comply with the Statute of Wills (see Study: Braucher, Unification of the Rules Governing Payment of Funds by Institutional Debtors on Death of the Person *493 Entitled and Designations of Beneficiaries to Receive Payment of Such Funds, 1951 Report of NY Law Rev Comm, pp 609, 618). Former section 24-a of the Personal Property Law, the predecessor of EPTL 13-3.2, was recommended by the Law Revision Commission simply to remove ‘any doubt as to the validity and effectiveness of beneficiary designations’ of pension, annuity and insurance contracts and to indicate that such designations were not required to be executed with the formality required by the Statute of Wills (see 1952 Report of NY Law Rev Comm, p 177). Accordingly, the statute provides that the rights of such beneficiaries ‘shall not be impaired or defeated by any statute or rule of law governing the transfer of property by will, gift or intestacy’ (EPTL 13-3.2, subd [a]), provided that the designation is made in writing, is signed by the person making it, and is, so far as here relevant, made in accordance with the rules prescribed for the pension plan or is agreed to by the insurer (EPTL 13-3.2, subd [d], pars [1], [2]). Thus, the statute relied upon by the Kane sons merely provides that such designations of beneficiaries are not invalid if accomplished by a document not executed with the formalities required by the Statute of Wills, but it does not answer the question raised here, the converse of that proposition, namely, whether a provision in a will changing the beneficiaries of an insurance contract is valid” {id. at 151).
Clearly, then, the statute was intended to overcome a technicality regarding the formalities required by the Statute of Wills, not to prevent the application of EPTL 3-5.1 (b) (2) and similar laws to benefit plans. That being so, EPTL 13-3.2 (a) does not cast doubt on my proposed application of EPTL 3-5.1 (b) (2) to benefit plans. In light of my conclusion that the latter statute encompasses death benefit and retirement plans, I would answer the second certified question in the affirmative.
m.
In relation to contracts, choice-of-law issues are often vexing and complex, routinely dividing courts over the conclusion that a certain state’s law applies and the proper method by which such a conclusion should be reached. But, the vagaries of this *494 area of law should not cause us to lose sight of the vital substantive policies established by the legislature, and where it is possible to reconcile those policies with the terms of the parties’ contract, it behooves us to do so. Here, because the substantive policy of New York requires the application of EPTL 3-5.1 (b) (2) to retirement and death benefit plans, I conclude that, absent an unequivocal waiver of the statute’s application, benefit plans of the kind at issue here should be interpreted to trigger EPTL 3-5.1 (b) (2). Accordingly, I would answer the first and second certified questions in the affirmative, and I dissent from the majority’s contrary decision.
Chief Judge Lippman and Judges Pigott and Fahey concur; Judge Abdus-Salaam dissents and votes to answer the certified questions in the affirmative in an opinion in which Judge Rivera concurs.
Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of this Court’s Rules of Practice, first certified question answered in the negative and second certified question not answered as academic.

. The majority observes that the title of article 3 “is not determinative” because the “text of [a] statute takes precedence over title, which cannot alter or limit the language in the body of a statute itself” (majority op at 474 n 4). That is true, and I do not suggest otherwise. But it is equally true that the title of article 3 is in accord with the plain meaning of the text and history of EPTL 3-5.1 (b) (2), all of which support the conclusion that EPTL *486 3-5.1 (b) (2) is part of the substantive law of New York (see D’Amico v Christie, 71 NY2d 76, 84 [1987] [where statutory text and history suggest a certain interpretation, the title of the statute reinforces that interpretation because the law’s meaning “is made plain even by its title”]).

. In discussing the expectations of the parties to the contracts here, the majority seems to focus primarily on MMBB’s expectations and lack of desire to transfer the benefits of the plans in accordance with EPTL 3-5.1 (b) (2) (see majority op at 475-476). To an extent, this approach is understandable because MMBB drafted the plans at issue here and had more control over their terms. But a focus on MMBB’s presumed wish to avoid the purported burdens imposed by EPTL 3-5.1 (b) (2) — a wish not directly expressed in the benefit plans — overlooks the fact that Flesher presumably expected that his property would devolve in accordance with the entirety of New York’s substantive statutory law, i.e., that all of his personalty would pass under *489 the laws of the state where he chose to live out his final days. Indeed, while the majority assumes that Flesher wanted to give up the protections which that state’s law might confer upon his property, such as the automatic elimination of the inheritance rights of his ex-spouse LeAnn Snow and her family, there is no basis for that assumption, especially since there is no indication that Flesher willingly waived the potential benefits of EPTL 3-5.1 (b) (2) in exchange for some particular valuable consideration (cf. Welsbach Elec. Corp., 7 NY3d at 630-631 [“(n)o good reason can be suggested why a contractor cannot, for a valuable consideration, waive the provisions of the statute giving him the right to file a notice of lien” (emphasis added, internal quotation marks, punctuation and citations omitted)]).