■ Rapp B. Properties, LLC, Respondent-Appellant, v RLI Insurance Company et al., Appellants-Respondents. [885 NYS2d 283]—

Order, Supreme Court, New York County (Edward Lehner, J.), entered November 10, 2008, which denied the parties' respective motions for summary judgment, unanimously modified, on the law, the motion by RLI and Alea North America (the insurer defendants) granted and the complaint and all cross claims dismissed as against them, and otherwise affirmed, without costs. The Clerk is directed to enter judgment accordingly in favor of said defendants.

Plaintiff seeks indemnification under the insurers' policies for damage to its building's south wall as a result of collapse, an allegedly covered peril, which occurred "[o]n or about July 19, 2005 and continuing thereafter." The complaint cites damage consisting of "severe cracking, bulging, splaying and displacement of the exterior brick facade." The insurers disclaimed coverage on the ground that the damage was "due to wear & tear and gradual deterioration not collapse." Collapse with respect to buildings is defined as follows under the policies' additional coverage provisions:

"a. Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose;

"b. A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;

"c. A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building;

"d. A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion."

The interpretation of an unambiguous provision of an insurance contract is a question of law for the court (*White v Continental Cas. Co.*, 9 NY3d 264, 267 [2007]). Accordingly, regardless of the cause or causes of the damage, it was error for the court to deny the insurers' motion, because there was no collapse within the meaning of the policies. Michael H. Rappaport, plaintiff's managing member, testified that the building

and its south wall were still standing three months after the damage was observed in July 2005. Standing alone, Rappaport's testimony suffices to belie any claim that the wall's collapse was "abrupt" within the meaning of the additional coverage provisions. John Paul Murray, plaintiff's architect, observed displacement of brick masonry units and opined that there was an "imminent risk that the wall would completely collapse." In light of subparagraph (b) above, which excludes imminent collapse from the definition, Murray's affidavit does not bring the occurrence within the coverage of the policies. In *Rector St. Food Enters., Ltd. v Fire & Cas. Ins. Co. of Conn.* (35 AD3d 177, 178 [2006]), this Court held that a building that was "shown to have had two-to-three-inch-wide cracks in its facade and was sinking, out of plumb, and leaning" did not meet a materially identical definition of collapse. Rappaport's affidavit is also unavailing insofar as he claims to have discovered that bricks had fallen from the inside of the wall where it was covered by sheetrock and tile. As noted above, the wall was still standing. Tellingly, Rappaport describes the condition as hidden "decay," a phenomenon which, by definition, does not occur abruptly.

There exists, however, a triable issue of fact as to whether the damage to the building was caused by a 624 square foot vinyl outdoor sign installed by defendants City Outdoor and NPA East Billboard (the sign defendants). In this regard, Murray opined that the tension created by tightly stretching the sign against its fasteners contributed to the failure of the south wall. According to Murray, the vinyl is stretched to a pressure of up to 170 pounds per square inch. The sign defendants' assertion that Murray, an architect, is unqualified to render such an opinion lacks merit. The profession of architecture involves "the application of the art, science, and aesthetics of design and construction of buildings . . . including their components and appurtenances . . . wherein the safeguarding of life, health, property, and public welfare is concerned" (Education Law § 7301). Concur—Mazzarelli, J.P., Andrias, Nardelli, DeGrasse and Abdus-Salaam, JJ.